In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3345

CATHY MARIE LANTZ,

*Petitioner-Appellee,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellant.*

Appeal from the United States Tax Court.
No. 25078-06—**Joseph R. Goeke**, *Judge*.

ARGUED APRIL 9, 2010—DECIDED JUNE 8, 2010

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. Taxpayers filing a joint return are jointly and severally liable for the entire tax liability shown or that should have been shown on their return. 26 U.S.C. § 6013(d)(3). But section 6015 of the Internal Revenue Code sets forth grounds—"innocent spouse" rules first added to the Code in 1971 and liberalized since, Lily Kahng, "Innocent Spouses: A Critique of the New Tax Laws Governing Joint and Several Tax Liability," 49 *Vill. L. Rev.* 261, 264-70 (2004); Svetlana G. Attestatova,

Comment, "The Bonds of Joint Tax Liability Should Not Be Stronger Than Marriage: Congressional Intent Behind § 6015(c) Separation of Liability Relief," 78 *Wash. L. Rev.* 831, 831-41 (2003)—for relieving the signer of a joint return of his or her joint and several liability for understatement or nonpayment of income tax due.

Section 6015(f), captioned "equitable relief," provides that "under procedures prescribed by the [Department of the Treasury], if (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency . . . ; and (2) relief is not available to such individual under subsection (b) or (c) [of section 6015], the [Department] may relieve such individual of such liability." By regulation the Treasury has fixed a deadline for filing claims under subsection (f) of two years from the IRS's first action to collect the tax by (for example) issuing a notice of intent to levy on the taxpayer's property. 26 C.F.R. § 1.6015-5(b)(1); see also IRS Rev. Proc. 2003-61 § 4.01(3); 26 U.S.C. § 6630(a). The Tax Court in a divided opinion invalidated the deadline in the regulation and the Internal Revenue Service appeals.

The taxpayer, Cathy Lantz, is a financially unsophisticated woman whose husband, a dentist, was arrested for Medicare fraud in 2000, convicted, and imprisoned. They had been married for only six years when he was arrested and there is no suggestion that she was aware of, let alone complicit in, his fraud. The IRS learned that the joint return the couple had filed had understated their federal income tax liability in the last

tax year before his arrest, and the Service assessed them more than $900,000 in additional income tax, penalties, and interest.

In 2003 Cathy Lantz received from the IRS—in a packet that included a notice of a proposed levy on her and her husband's property—publications explaining the collection process, alerting the recipient to the possibility of innocent-spouse relief, and citing an IRS publication explaining the rights of such a spouse. Included in the packet was a form for requesting a "collection due process" hearing. The taxpayer can indicate that she is seeking innocent-spouse relief by checking a box on the form and filing an application for such relief. Lantz did not respond to the IRS's communication, however, because her husband (from whom she had been estranged since his conviction) told her he'd deal with the matter. He returned the form requesting a collection due process hearing and asked to be sent the application form for seeking innocent-spouse relief, explaining that his wife was an "innocent spouse." But, assuming he received that form, he died before filing it.

In 2006 the IRS, unable to collect any of its tax assessment from the husband (and by now he was dead), applied the $3,239 income tax refund for 2005 to which Lantz would otherwise have been entitled to her joint (and now several) liability for 1999, which had grown to more than $1.3 million. Unemployed and impecunious, she applied for innocent-spouse relief but the IRS turned her down because she'd missed the two-year deadline from the date (in 2003) on which the Service

had sent her the notice of intent to file a levy on her and her husband's property. The Service concedes that were it not for the deadline, Lantz would be eligible for relief. But the concession does not bear on the validity of the deadline; *any* statute of limitations will cut off some, and often a great many, meritorious claims.

In invalidating the two-year deadline that the Treasury has imposed on claims under subsection (f), the Tax Court noted that each of the two other subsections of 26 U.S.C. § 6015 that we mentioned, (b) and (c), contains a two-year deadline, 26 U.S.C. §§ 6015(b)(1)(E), (c)(3)(B), while subsection (f) does not. From this difference the court inferred that Congress intended subsection (f) to have no deadline. The court said that "by explicitly creating a 2-year limitation in subsections (b) and (c) but not subsection (f), Congress has 'spoken' by its audible silence."

Appellate review of pure legal rulings by the Tax Court, as by a district court, is plenary, 26 U.S.C. § 7482(a)(1); *WellPoint, Inc. v. Commissioner*, 599 F.3d 641, 644 (7th Cir. 2010); *Kikalos v. Commissioner*, 434 F.3d 977, 981 (7th Cir. 2006); *Wright v. Commissioner,* 571 F.3d 215, 219 (2d Cir. 2009), and administrative regulations issued pursuant to authority delegated by Congress must be upheld unless unreasonable. *United States v. Mead Corp.*, 533 U.S. 218, 228-29 (2001); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 and n. 11 (1984). But even if our review of statutory interpretations by the Tax Court were deferential, we would not accept "audible silence" as

a reliable guide to congressional meaning. "Audible silence," like Milton's "darkness visible" or the Zen *koan* "the sound of one hand clapping," requires rather than guides interpretation. Lantz's brief translates "audible silence" as "plain language," and adds (mysticism must be catching) that "Congress intended the plain language of the language used in the statute."

Whatever any of this means, the Tax Court's basic thought seems to have been that since some statutes (in this case, some provisions of a statute) prescribe deadlines, whenever a statute (or provision) fails to prescribe a deadline, there is none. That is not how statutes that omit a statute of limitations are usually interpreted. Courts "borrow" a statute of limitations from some other statute in order to avoid the absurdity of allowing suits to be filed centuries after the claim on which the suit was based arose. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 146-57 (1987); *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 158-62 (1983); *Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002). They borrow an existing statute of limitations rather than create one because "the length of a limitations period is arbitrary—you can't reason your way to it—and courts are supposed not to be arbitrary; when they are, they get criticized for it." *Hemmings v. Barian*, 822 F.2d 688, 689 (7th Cir. 1987). Courts even say that in borrowing a statute of limitations from one statute for use in another they are doing Congress's will: "Given our longstanding practice of borrowing state law, and the congressional awareness of this practice, we can generally assume that

Congress intends by its silence that we borrow state law." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, *supra*, 483 U.S. at 147.

Agencies, in contrast, being legislative as well as adjudicatory bodies, are not bashful about making up their own deadlines. See, e.g., *Johnson v. Gonzales*, 478 F.3d 795, 798-800 (7th Cir. 2007); *Swallows Holding, Ltd. v. Commissioner*, 515 F.3d 162, 170-72 (3d Cir. 2008); *Stearn v. Department of Navy*, 280 F.3d 1376, 1381-84 (Fed. Cir. 2002); *Foroglou v. Reno*, 241 F.3d 111, 113 (1st Cir. 2001); *Withey v. Perales*, 920 F.2d 156 (2d Cir. 1990). And because they are not bashful, and because it is as likely that Congress knows this as that it knows that courts like to borrow a statute of limitations when Congress doesn't specify one, the fact that Congress designated a deadline in two provisions of the same statute and not in a third is not a compelling argument that Congress meant to preclude the Treasury Department from imposing a deadline applicable to cases governed by that third provision. Whether the Treasury borrowed the two-year limitations period from subsections (b) and (c) or simply decided that two years was the right deadline is thus of no consequence; either way it was doing nothing unusual.

Lantz suggests that because section 6502 of the Code imposes a 10-year deadline on the government's right to collect taxes that it is owed, there *is* a time limit on claims for relief under section 6015(f)—ten years—and so the absurdity of allowing claims under subsection (f) to be filed until the Day of Judgment is avoided. But this argument confuses an external circumstance that as a practical

matter creates a time limit with a statute of limitations. It is true that if after 10 years from the date of assessment, which itself must take place within three years after the tax return was filed, the IRS has not moved to collect the tax by levying on the taxpayer's property or wages or sued to collect the tax, it usually has to give up. 26 U.S.C. §§ 6501(a), 6502(a); *United States v. Galletti*, 541 U.S. 114, 116 (2004); *Clark v. United States*, 63 F.3d 83, 84-85 n. 1 (1st Cir. 1995). But to call this a statute of limitations for claims under subsection (f) is like saying that claims for defamation have an outside statute of limitations of 123 years, because the common law rule (still in force in many states) is that a defamation claim dies with the death of the victim of the defamation, Dan B. Dobbs, *The Law of Torts* § 407, pp. 1139-40 (2000), and according to *Wikipedia* 122.5 years is the longest life span verified by modern documentation. http://en.wikipedia.org/wiki/Longevity (visited Apr. 10, 2010).

More important, the 10-year limit in section 6502 is not a constraint on *taxpayer* action. It's the period within which the IRS must act to collect a tax. True enough that if it misses its deadline the taxpayer has no need to invoke 6015(f). But if it does act within this period, section 6502 imposes no time limit on the taxpayer's response.

In the case of equitable claims, often the doctrine of laches (unreasonable delay prejudicial to the defendant, *Kansas v. Colorado*, 514 U.S. 673, 687 (1995); *Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*, *supra*, 283 F.3d at 880) is substituted for a fixed

deadline, and that might seem an attractive way of limiting the time within which a taxpayer can seek relief under section 6015(f). The doctrine was developed by the English equity court before the enactment of the first statutes of limitations, when the problem of stale claims was therefore acute. "Even when there were no statutory periods, the Chancellor in Equity, the 'King's Conscience,' could withhold relief when the plaintiff's delay in coming to Equity was inordinate and had caused prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997); see Gail L. Heriot, "A Study in the Choice of Form: Statutes of Limitation and the Doctrine of Laches," 1992 *B.Y.U. L. Rev.* 917, 923-27 (1992). So laches provides a way of dealing with a statute that specifies no limitations period.

Equitable claims usually involve ongoing activity—the plaintiff is trying to stop something that's going on now even if the reason lies far in the past, which is the case here—so the need for a fixed deadline is somewhat less because most of the evidence is likely (though not in this case) to concern the present rather than the past and thus be fresh rather than stale. A rigid deadline would, moreover, have been inconsistent with the discretionary character of the equity jurisdiction and the chancellor's historic function of doing justice when courts of law were bound by rigid rules, of which statutes of limitations (before the modern emergence of discovery rules and tolling doctrines) were good examples. Laches fitted nicely with such long-established equitable maxims as "he who seeks equity must do equity" and "equity aids the vigilant, not those who sleep

on their rights." See Kathryn E. Fort, "The New Laches: Creating Title Where None Existed," 16 *Geo. Mason L. Rev.* 357, 364-69 (2009); Eric Fetter, Note, "Laches at Law in Tennessee," 28 *U. Memphis L. Rev.* 211, 213-17 (1997).

Well, "equitable" is in the caption and in the body of section 6015(f). And we've found cases in which laches was invoked to bar a taxpayer's claim. *United States v. Matheson*, 532 F.2d 809, 820-21 (2d Cir. 1976); *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 840-42 (Tax Ct. 1980); see also Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 115.7 (2010). (In contrast, the government probably isn't barred by its own laches in suits to collect taxes, *Hatchett v. United States*, 330 F.3d 875, 887 (6th Cir. 2003); cf. *United States v. Brockamp*, 519 U.S. 347 (1997); *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461-63 (Fed. Cir. 1998), though that is an open question in this court. *United States v. Administrative Enterprises, Inc.*, 46 F.3d 670, 672-73 (7th Cir. 1995).)

But neither party suggests that laches might be an adequate substitute for a fixed deadline, and there is a compelling reason why it would not be. Had the Treasury decided to impose no deadline on the filing of claims under subsection (f), or even just a deadline longer than two years, or in lieu of a fixed deadline the flexible deadline of the laches doctrine, it would have been undermining the two-year deadline fixed by Congress in subsections (b) and (c). For remember that a condition of relief under (f) is that the claimant be ineligible for relief under either of the other subsections.

Subsection (b) grants relief to a joint filer of a return that is found to understate the joint-filers' liability, if "in signing the return he or she did not know, and had no reason to know, that there was [an] understatement; [and] taking into account all the facts and circumstances, it is inequitable to hold [him or her] liable for the deficiency in tax . . . attributable to such understatement." 26 U.S.C. §§ 6015(b)(1)(C), (D). Were it not for the Treasury's imposed deadline, Lantz would almost certainly be eligible for innocent-spouse relief under subsection (b) as well as under (f). The substantive criterion for relief under (f)—"taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency"—is also a criterion for relief under (b). And although an additional criterion specified in (b) but not in (f) is that the applicant not have known or have had reason to know of the understatement, it is an important factor in determining the applicant's equitable claim under (f) as well, though exceptions are allowed. IRS Rev. Proc. 2003-61, §§ 4.02(1)(b), 4.03(2)(a)(iii); *Greer v. Commissioner*, 595 F.3d 338, 352 (6th Cir. 2010); *Commissioner v. Neal*, 557 F.3d 1262, 1276-78 (11th Cir. 2009); *Washington v. Commissioner*, 120 T.C. 137, 150-51 (Tax Ct. 2003). An applicant who manages to satisfy *both* criteria in subsection (b) is thus bound to satisfy the criterion in (f). So, on the Tax Court's view, the two-year deadline imposed by subsection (b) drops away; anyone eligible for relief under (b) is eligible for relief under (f) no matter when she applies.

It's also likely that had Lantz not missed the two-year deadline in subsection (c) she would have been eligible

for innocent-spouse relief under that subsection as well. It provides relief to a joint-filing spouse who at the time of applying for it either is no longer married to the person with whom she filed the joint return or is legally separated from him or has not been living with him for at least 12 months. Lantz's husband died before she filed for relief, and a widow filing for relief is eligible under subsection (c). 26 C.F.R. § 1.6015-3(a). (And she hadn't been living with him for the previous three years and was about to divorce him when he died.) She probably meets the substantive eligibility conditions under subsection (c) as well—that the spouse claiming relief have had no actual knowledge of the understatement of tax liability and not have received assets that her spouse had given her to avoid taxes or with some other fraudulent motive. 26 U.S.C. §§ 6015(c)(3)(A)(ii), (C), (4).

In short, if there is no deadline in subsection (f), the two-year deadlines in subsections (b) and (c) will be set largely at naught because the substantive criteria of those sections are virtually the same as those of (f).

Subsection (f), in contrast to (b) and particularly (c), is brief, probably because it's a safety-valve provision for innocent spouses who fall through cracks in (b) or (c). The details of the safety valve were left to the Treasury Department to work out and an important detail—the deadline for application—was created by the Treasury regulation that the Tax Court has invalidated. It's as if Illinois passed a statute authorizing the issuance of drivers' licenses containing the licensee's Zodiacal sign

but specifying no deadline for applications, and the Driver Services Department, which is responsible for issuing licenses, promulgated a regulation requiring that applications for the special license be filed one month before the expiration of the driver's current license. Would anyone say that the state legislature had by its "audible silence" forbidden the Department to impose such a deadline?

Moreover, subsection (f) does not *require* the IRS to grant relief even to an applicant who fully satisfies the criteria set out in the subsection; for it states that if those criteria are satisfied the Service "*may* relieve such individual of such [joint-filer] liability" (emphasis added). Since the government can refuse to grant equitable relief to someone who meets the statutory criteria and applies within two years of the first collection action, why can't it decide to deny relief to a *class* of applicants defined as those who waited too long? Cf. *Lopez v. Davis*, 531 U.S. 230, 238, 243 (2001), where the Supreme Court rejected the argument that the Bureau of Prisons "must not make categorical exclusions, but may rely only on case-by-case assessments." The power to make such exclusions is implicit in the grant of rulemaking authority to an agency and insistence on "case-by-case decisionmaking in thousands of cases each year . . . could invite favoritism, disunity, and inconsistency." *Id*. at 244. Since subsection (f) requires the Treasury to devise the appropriate substantive standards (as well as the relevant procedures) for the grant of equitable relief, one would expect Congress to leave it up to the Treasury to establish deadlines optimized to the substantive

criteria, as different criteria could require different lengths of time to satisfy.

We must also not overlook the introductory phrase in subsection (f)—"under procedures prescribed by the [Treasury Department]"—or the further delegation in 26 U.S.C. § 6015(h) to the Treasury to "prescribe such regulations as are necessary to carry out the provisions of" section 6015. In related contexts such a delegation has been held to authorize an agency to establish deadlines for applications for discretionary relief. *Johnson v. Gonzales, supra*, 478 F.3d at 799; *Swallows Holding, Ltd. v. Commissioner, supra*, 515 F.3d at 170-72; see also *Foroglou v. Reno, supra*, 241 F.3d at 113; cf. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543 (1978). Congress's authorizing an agency to grant discretionary relief under procedures that the agency is to devise itself, as distinct from telling the agency when it *must* grant relief, writes the agency a blank check; and one of the blanks on the check is the deadline for applying for such relief.

True, subsection (b) contains the same introductory language as (f)—"under *procedures* prescribed by the [Treasury Department]" (emphasis added)—yet goes on to fix a two-year limit; and so Lantz argues that deadlines must not be "procedural." But (b) is captioned "*procedures for relief from liability applicable to all joint filers*" (emphasis added), and one of the procedures is the two-year deadline. We mustn't take the caption literally, since subsection (b) contains substantive criteria, such as the applicant's knowledge of the understatement or

underpayment. But the caption implies that at least some of the criteria are procedural in character—Congress specified some of the procedures and left others to be created by the Treasury.

We further note that while subsections (b) and (c) are limited to understatements of liability, (f) includes underpayments as well. Cases in which tax liability is acknowledged but the taxpayer simply fails to pay it in full are legion (understatements are common too, but of course often never discovered), and we doubt that Congress would want to preclude the Treasury from imposing a deadline designed to reduce the flow to manageable proportions.

Lantz points out that the circumstances bearing on the equities of a claim for equitable relief may change over the course of the ten years in which the IRS may be trying to collect unpaid taxes. Maybe when the IRS makes its first effort to collect them the innocent spouse is wealthy, and so while innocent doesn't have a compelling *equitable* claim for relief, but that later, with the IRS doggedly persisting in its collection efforts, she is in poverty but past the two-year deadline for seeking innocent-spouse relief. But this argument is really a quarrel with Congress, because it is equally an argument against the two-year statutory deadline in subsection (b). The guilty spouse may have understated his income on the joint return and the innocent spouse may not have sought (or, if she did seek, may not have obtained) relief under (b) because she was wealthy, but five years later she is poor but no longer eligible because

of the two-year deadline. So the taxpayer's argument reduces to: Congress knew it was fixing an unfair deadline in subsection (b), so it said to taxpayers (in an "audible silence"), "don't worry about the two-year deadline because after two years you can seek the identical relief under (f)." That would be an odd way to legislate.

The arguments against the Tax Court's interpretation of subsection (f) as barring a fixed deadline may not be conclusive, though they are powerful. But federal income taxation is immensely complex, and Congress does not have the time or the knowledge to formulate comprehensive rules for its administration. It delegates expansive authority to the Treasury, which promulgates regulations only after long and painstaking consideration. The delegation in section 6015(f) is express, and the cases are legion that say that Treasury regulations are entitled to judicial deference, e.g., *Boeing Co. v. United States*, 537 U.S. 437, 447-48 (2003); *United States v. Correll*, 389 U.S. 299, 307 (1967); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Bankers Life & Casualty Co. v. United States*, 142 F.3d 973, 979-83 (7th Cir. 1998); *In re Hartman Bros. Construction Corp.*, 835 F.2d 1215, 1218 n. 3 (7th Cir. 1987)—all the more so if "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); see also *Bankers Life & Casualty Co. v. United States*, *supra*, 142 F.3d at 979; *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1329 (7th Cir. 1986); *Armstrong World Industries, Inc. v. Commissioner*, 974 F.2d 422, 430 (3d Cir. 1992). Remember that subsection (f) provides that "under procedures prescribed by the [Treasury]" an innocent

spouse may be granted equitable relief under that subsection, while subsection (h) provides that "the [Treasury] shall prescribe such regulations as are necessary to carry out the provisions of [section 6015]" in general.

Our conclusion that Lantz's claim for equitable relief was properly rejected is harsh. But it does not leave her remediless. The Treasury provides avenues of relief to taxpayers who would experience hardship from continued pertinacious efforts by the Internal Revenue Service to collect unpaid taxes from them. Of particular relevance to Lantz, given her meager pecuniary resources, section 6343(a)(1)(D) of the Internal Revenue Code authorizes the IRS to "release the levy upon all, or part of, the property or rights to property [of the taxpayer] levied upon if . . . [the IRS] has determined that such levy is creating an economic hardship due to the financial condition of the taxpayer." And the levy *must* be released if it "is creating an economic hardship due to the financial condition of an individual taxpayer . . . [by causing the taxpayer] to be unable to pay his or her reasonable basic living expenses." 26 C.F.R. § 301.6343-1(b)(4). See also *Vinatieri v. Commissioner*, 133 T.C. No. 16, 2009 WL 4980692, at *5-6 (Tax Ct. Dec. 21, 2009). The Service thus can or, depending on circumstances, must declare the taxes "currently not collectible" and stop levying on a taxpayer's meager property, though it reserves the right to renew collection efforts should the taxpayer experience a windfall ("winning the lottery" is the conventional example). *Internal Revenue Manual* § 5.16.1.2.9(10) (May 5, 2009), www.irs.gov/irm/part5/irm_05-016-001.html (visited May 8, 2010). Ironically, the Service declared the taxes

owed by Lantz's husband—the crooked dentist—"currently not collectible." She is entitled *a fortiori* to such relief, and there is no deadline for seeking it. We can at least hope that the IRS knows better than to try to squeeze water out of a stone.

REVERSED AND REMANDED.