T.C. Memo. 2010-267

UNITED STATES TAX COURT

ELIZABETH B. KELLY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3870-09.               Filed December 8, 2010.

<u>Stephen J. Dunn</u>, for petitioner.

<u>A. Gary Begun</u> and <u>Robert D. Heitmeyer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Petitioner brings this case seeking review of
respondent's decision to deny petitioner relief from joint and
several liability under section 6015[1] with respect to income

---

[1]Section references are to the Internal Revenue Code of
1986, as amended.  Rule references are to the Tax Court Rules of
Practice and Procedure.

taxes of $97,288[2] and $114,877 for tax years 2004 and 2005, respectively.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in the State of Michigan at the time the petition was timely filed. Despite the fact that two notices of filing of the petition and right to intervene were served on Sean Kelly (Mr. Kelly) at his last known address on March 6 and August 18, 2009, respectively and that notice was also sent to his counsel on August 18, 2009, Mr. Kelly did not intervene and did not participate in the trial.

Petitioner received a bachelor's degree in social science from Michigan State University in 1979. During college petitioner began dating Mr. Kelly, and they "partied a lot" together. Petitioner and Mr. Kelly married in 1981. Petitioner testified that she noticed Mr. Kelly's heavy drinking before and during the early years of her marriage. She also developed an alcohol dependence.

After college petitioner worked in various sales assistant positions. In 1987 petitioner started working with Mr. Kelly at a brokerage and investment services company, Portfolio Analytics,

_____

[2]Petitioner and Sean Kelly's (Mr. Kelly) 2004 tax return reflected a mathematical error of $97,955. The correct amount should be $97,288.

Inc. (Portfolio). Petitioner was Portfolio's office administrator who kept records, managed the office, and provided client services. Notwithstanding her low-ranked position in contrast to that of her husband, who was a marketing consultant, petitioner had an ownership interest in Portfolio, an S corporation.

In 1997 Mr. Kelly and his parents, Joseph and Suzanne Kelly incorporated EPC Consulting, Inc. (EPC Consulting), a corporation that structured early retirement plans of teachers on the West Coast. Mr. Kelly's father spun off EPC Consulting from EPC Management, a company he founded, to give Mr. Kelly control over a specific geographic area while EPC Management continued to render services to its clients on the East Coast. Mr. Kelly managed EPC Consulting's daily operations.

In 1998 petitioner and Mr. Kelly jointly purchased a home in Milford, Michigan, valued at approximately $900,000. Petitioner was a signatory to the mortgage.

After petitioner and Mr. Kelly had been married for over 28 years and had three children, they became estranged. Mr. Kelly was strong willed and very opinionated. During their marriage Mr. Kelly drank heavily and developed a substance abuse problem. By 2001 petitioner realized that Mr. Kelly had a substance abuse problem and that he had begun to spend more time in Detroit and Canada frequenting multiple establishments commonly referred to

as "gentlemen's" clubs.  She felt humiliated by her husband's patronage of those clubs.  By 2003 or 2004 Mr. Kelly's excursions would last for several nights, and his recovery afterwards would extend for a long period during which he would lie on the couch immobilized.  His substance abuse had adversely affected his work at EPC Consulting and eventually led him to seek medical treatment for his addictions in 2006.

Mr. Kelly's alcoholism also strained the already tenuous business relationship between his parents and him.  His parents disapproved of Mr. Kelly's extravagant expenses charged to the business' account, including his first-class airline flights, limousine rentals, lengthy stays at luxury hotels, dining at high-end restaurants, and use of the corporate credit card for personal expenses incurred at "gentlemen's" clubs--many of which he failed to reimburse.  An altercation between Mr. Kelly and his sister further inflamed his parents.  Although he knew that his sister was pregnant, Mr. Kelly aggressively pushed her around when she confronted him about the "personal expenses" he charged to the business account.  Immediately after the incident his sister had a miscarriage.  Neither petitioner nor their children witnessed this physical altercation, and Mr. Kelly never used this incident to intimidate petitioner.

Because of those problems Mr. Kelly's parents decided to "buy him out" of EPC Consulting and structured the buyout as a

severance plan.[3]  Mr. Kelly was supposed to receive per the Severance, Release, and Stock Purchase agreement[4] (severance agreement) $550,646.09, $417,641, $467,746, and $205,718[5] for 2003, 2004, 2005, and 2006, respectively.  In 2004 Mr. Kelly actually received a payment of $420,083.44,[6] consisting of a $410,650.09 severance payment and a $9,433.35 reimbursement for "additional expenses".  In 2005 Mr. Kelly actually received a severance payment of $393,974 because his anticipated 2005 payment was reduced by a partial advance from his 2006 payment.  Although the payments were made to him individually, Mr. Kelly indicated on his 2004 and 2005 tax returns that the payments were

---

[3]Petitioner submitted into evidence two agreements which Mr. Kelly and his parents entered into on the same day, Jan. 1, 2003. The first agreement states that Mr. Kelly would be hired and paid as a consultant.  The second agreement, Severance, Release and Stock Purchase agreement (severance agreement), states that Joseph D. Kelly, Suzanne Kelly, and Timothy Bell would each pay Mr. Kelly $1 in exchange for his EPC Consulting stock in addition to making severance payments to him.

[4]The severance agreement contained a chart setting forth when Mr. Kelly would receive his severance.  EPC Consulting often diverged from the payment schedule.  For example, Mr. Kelly received an overpayment of $6,990.91 in tax year 2003, and this payment was deducted in the subsequent year.

[5]Although Mr. Kelly was supposed to receive under the severance agreement a payment of $205,718 in 2006, Mr. Kelly requested that Joseph Kelly, Suzanne Kelly and Mr. Bell advance that payment by borrowing the funds from a bank.  Consequently, the 2003 and 2005 payments were reduced by the borrowed amount, finance fees, and interest.

[6]This severance payment was reduced by $6,990.91 because Mr. Kelly was overpaid in the previous year 2003.

income of Sean Kelly, L.L.C. These payments were significantly more than Mr. Kelly earned at Portfolio and constituted most of the income petitioner and Mr. Kelly reported on their joint returns for 2004 and 2005. Petitioner knew of the agreement and the actual amount of each payment. Although Mr. Kelly deposited the funds in his own account, he transferred funds to their joint account whenever petitioner so requested.

Throughout the marriage petitioner was responsible for paying the household expenses. Petitioner paid the monthly mortgage payment of $5,000, the monthly utility bill of $1,000, the monthly car payment of $1,500 for the three cars petitioner and her children drove and the monthly payment for Mr. Kelly's Corvette, the yearly private high school tuition of $8,000-$9,000 for one of their children, and the yearly Michigan State University tuition of $20,000 for their oldest child. In addition, petitioner and Mr. Kelly had kept a horse training and boarding venture that operated as the Double K Ranch, L.L.C., and reported over $55,500 in losses for tax years 2004 and 2005. Petitioner kept one of the horses after she separated from Mr. Kelly.

Despite their substantial income petitioner knew as early as 2003 that she and her husband faced financial woes. Petitioner and Mr. Kelly often were not able to afford their children's tuition. They had bad credit, could not get a credit card, and

had to rely on the corporate credit card EPC Consulting provided to pay their personal expenses.

Petitioner was responsible for providing information and documents to her and Mr. Kelly's accountant and writing the checks to pay their Federal income tax throughout the marriage. For tax years 2001, 2002, and 2003 petitioner and Mr. Kelly filed joint Federal income tax returns reporting balances due. To pay those balances petitioner signed and remitted checks written against her and Mr. Kelly's joint checking account.

As they had done for previous tax years, petitioner and Mr. Kelly hired an accountant to prepare their joint Federal income tax returns for 2004 and 2005. The returns reported all of the gross income that petitioner and Mr. Kelly each earned from Portfolio in 2004 and 2005. Petitioner and Mr. Kelly were both employees of Portfolio in 2004 and 2005. Each spouse received Forms W-2, Wage and Tax Statement, from Portfolio for 2004 and 2005. Their 2004 and 2005 returns also reported the substantial severance payments as self-employment income and the deductible losses petitioner received as flowthrough items from Portfolio.

For the tax year 2004 petitioner and Mr. Kelly filed a joint Federal income tax return reporting total income of $445,730, a tax liability of $128,934, and payment of $21,000. On the basis of those figures petitioner and Mr. Kelly actually

owed $97,288[7] for the tax year 2004.  In 2004 Portofolio withheld only $10,646.  Of the total income, $356,796[8] was attributable to Mr. Kelly's severance payment, $56,250 was petitioner's wage income from Portfolio, and $59,500 was Mr. Kelly's wage income from Portfolio.  Most of the tax petitioner and Mr. Kelly owed was attributable to the severance payment.  Nonetheless, petitioner and Mr. Kelly did not set aside any of the severance payment to pay the tax due on the payment.  However, to partially offset the income attributable to the severance payment, petitioner and Mr. Kelly claimed a loss of $17,219 from Portfolio.

For tax year 2005 petitioner and Mr. Kelly untimely filed a joint Federal income tax return reporting total income of $504,829, a tax liability of $139,619, an estimated tax penalty of $2,168, and a balance due of $114,877.  Of the total income, $320,974[9] was attributable to Mr. Kelly's severance payment, $55,625 was petitioner's wages from Portfolio, and $123,750 was

---

[7]Petitioner and Mr. Kelly erroneously calculated and reported $97,955 on their 2004 tax return.

[8]On their 2004 tax return they deducted $63,287 of Sean Kelly, L.L.C.'s expenses from the payments Joseph and Suzanne Kelly and Timothy Bell made.

[9]Petitioner and Mr. Kelly indicated on their 2005 return that the severance payment was the sole income of Sean Kelly, L.L.C.  They then reported a net profit of $345,527 after deducting expenses of $48,447 from the gross income of Sean Kelly, L.L.C.  They further deducted from the severance payment $24,553 of losses incurred in their horse venture.

Mr. Kelly's wages from Portfolio.  In 2005 Portfolio withheld $26,910 of their total wage income of $179,375.  They did not include a tax payment with their delinquent return.  However, petitioner and Mr. Kelly did partially offset the income attributable to the severance payment with the loss Portfolio distributed to petitioner and the loss incurred from their horse venture.  Mr. Kelly received the last severance payment in tax year 2005.

Petitioner knew the tax balances due for 2004 and 2005 because Mr. Kelly showed petitioner the returns the accountant had prepared.  Petitioner contends that she agreed to sign the their 2004 Federal income tax return because Mr. Kelly had agreed to pay the balance due.  Petitioner provided the same reason for her signing of their 2005 Federal income tax return even when their 2004 Federal tax balance remained outstanding at that time. However, the balances due were never paid, prompting respondent to file tax liens against petitioner and Mr. Kelly for the outstanding balances due on their 2004 and 2005 returns on July 28 and October 20, 2006, respectively.  Although two Notices of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 with respect to the 2004 and 2005 tax liabilities were sent to petitioner and Mr. Kelly on July 26 and on September 29, 2006, respectively, neither of them requested a collection due process hearing.

In 2006 Mr. Kelly had a relapse and began to drink again. After observing Mr. Kelly's relapse, petitioner recognized her own alcohol addiction and began to attend Alcoholics Anonymous meetings. Her recovery led her to make a commitment to move out of the house and improve herself. Nonetheless, petitioner and Mr. Kelly filed a joint tax return failing to report income of $18,858 from Portfolio for tax year 2006, causing a notice of deficiency to be issued. To resolve this deficiency, they filed an amended return on May 28, 2009, reporting offsetting losses from Portfolio suspended from prior years.

In 2007 petitioner was laid off from Portfolio. The record does not indicate whether petitioner sold her Portfolio stock. Petitioner did not file a joint or separate return for the tax year 2007 because she did not earn any income for that year. The record does not indicate whether Mr. Kelly filed a separate return for 2007.

During January and February 2008 petitioner received $125,000 from Mr. Kelly to pay their expenses, including their mortgage payments in arrears. Petitioner did not use any of that money to pay their joint tax liability for the tax year 2004 or 2005. Petitioner was unemployed until the end of February 2008. In May 2008, at the direction of his business partners, Mr. Kelly sought treatment again for his alcoholism.

On October 15, 2008, respondent received from petitioner a Form 8857, Request for Innocent Spouse Relief, for tax years 2004 and 2005. On January 15, 2009, respondent issued a determination denying petitioner relief from joint and several liability under section 6015(b), (c), and (f) because petitioner failed to meet the requirements for relief under section 6015. The notice of determination explained that petitioner did not request relief before the expiration of 2 years from the date of the first collection action taken against her for the tax years at issue. In response, petitioner timely filed her petition, seeking review of respondent's denial of equitable relief under section 6015(f).[10]

When petitioner submitted her Form 8857 in October 2008, she reported her gross income as $43,200 per year and her expenses as $69,600 per year for two adults and one child. The two adults identified on petitioner's Form 8857 were petitioner and her adult daughter, a college graduate who was employed as a substitute teacher. Petitioner acknowledged on Form 8857 that she and Mr. Kelly had trouble paying bills during 2004 and 2005 because their expenses equaled or exceeded their income. Petitioner also stated on that form that she was employed on

---

[10]Though respondent's determination denied her relief under sec. 6015(b), (c), and (f), petitioner seeks relief only under subsec. (f).

February 27, 2008, and Mr. Kelly "[had] not worked for a long time".

Petitioner did not physically separate from Mr. Kelly until February 2009 when she moved out of their home. In April 2009 petitioner timely filed a 2008 return with the status of married filing separately.

In April 2009 the Appeals office reconsidered petitioner's request for relief under section 6015. On April 6, 2009, petitioner submitted Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, reporting income and expenses that were different from what she had reported on her Form 8857 in October 2008. The Form 433-A reflected that per year her gross income was $48,480 and her expenses were $48,480.

Petitioner attached to the Form 433-A bank statements for 3 consecutive months and three pay stubs stating that she received $1,632.67, $1,599.06, and $1,630.06 on February 24, March 9, and March 22, 2009, respectively. For each of those consecutive months petitioner's total deposits always exceeded the wages she received. Petitioner's January 2009 bank statement indicates that petitioner made a total deposit of $3,687.06, consisting of a $500 cash deposit on January 23, 2009, and two check deposits of $1,541.67 and $1,632.67, on January 16 and 30, 2009, respectively. Petitioner's February 2009 bank statement indicates that petitioner deposited $600 in cash on February 17,

2009, and two checks for $1,632.67 and $1,532.67 on February 12 and 26, 2009, respectively. Petitioner's March 2009 bank statement indicates that petitioner made a deposit of $3,599.06, partly in cash and partly by check, on March 16; a check deposit of $220 on March 17; and a check deposit of $1,530.06 on March 23.

Petitioner's bank statements reflect monthly expenses including: $311.17 for "Dish Network", $235 for Verizon Wireless, and over $150 of expenses for the horse of which she retained possession after she left her and Mr. Kelly's home in February 2009.

Although petitioner testified that she currently has no retirement account and her Form 433-A reflects the same, she reported on her 2008 tax return an IRA account at Charles Schwab & Co., Inc. Despite petitioner's testimony that she had been driving a Saturn 2000 for 10 years, the record indicates that she drove a Ford 500 in 2005 and does not state that that car had been repossessed. She stated on Form 8857 that she and her husband were in arrears with their car payments.

As of September 2009 Mr. Kelly was evicted from the home in which he and petitioner once lived, and his Corvette, which he had purchased new in 2004, had been repossessed.

- 14 -

On November 4, 2009, the Circuit Court for Oakland County, Michigan, issued a judgment of divorce after Mr. Kelly failed to participate in the proceedings.

OPINION

The Court must decide whether petitioner is entitled to relief under section 6015(f).

Under section 6013(d)(3), a husband and wife filing a joint return are jointly and severally liable for all tax for the taxable year, including interest. Petitioner claims that she is entitled to relief under section 6015(f) from the tax liability reported on the joint tax returns she and Mr. Kelly filed for tax years 2004 and 2005.

Section 6015 relieves a spouse of joint and several liability in three situations: (1) If the spouse did not know or have reason to know of a tax deficiency when the return was signed and satisfies other conditions; (2) if a divorced or separated spouse seeks to limit individual liability to the portion of the deficiency attributable to him or her; and (3) in the case of a deficiency or of tax shown on a return but not paid, if it is inequitable to hold the spouse liable for the tax. See sec. 6015(b), (c), and (f), respectively. This last provision, found in section 6015(f), applies only if relief is unavailable to the taxpayer under the other two provisions. Because petitioner and Mr. Kelly's tax liabilities are attributable to nonpayment of tax

as shown on the 2004 and 2005 tax returns, petitioner could not have obtained relief under section 6015(b) or (c).  See sec. 6015(b)(1)(B), (c)(1); see also Washington v. Commissioner, 120 T.C. 137, 146-147 (2003).  She seeks relief instead under section 6015(f).

Standard of Review

The Commissioner may grant equitable relief from joint and several liability if he finds that, taking into account all of the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax, and if relief is not otherwise available under section 6015(b) or (c).  The Court's determination is made in a trial de novo.  See Porter v. Commissioner, 132 T.C. 203, 210 (2009).  In cases brought under section 6015(f), the Court applies a de novo standard of review as well as a de novo scope of review.  See id.  Petitioner bears the burden of proving that she is entitled to equitable relief under section 6015(f).  See Rule 142(a).  The Court has jurisdiction to determine whether a taxpayer is entitled to equitable relief under section 6015(f).  See sec. 6015(e)(1)(A). Therefore, the Court may consider evidence introduced at trial which was not included in the administrative record.  Both parties submitted evidence at trial which was not available to respondent's Appeals officer.  The Court has considered all relevant evidence in making its determination.

Threshold Requirements Under Rev. Proc. 2003-61, Sec. 4.01

Under section 6015(f) the Commissioner decides whether to grant relief according to procedures the Secretary has prescribed.  These procedures have been described in Rev. Proc. 2003-61, 2003-2 C.B. 296.  Under section 6015(e) and (f)(1), the Court will consider all relevant facts and circumstances in determining whether petitioner is entitled to relief.  As explained in Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298, in order for the Commissioner to provide relief under section 6015(f), the requesting spouse must satisfy all of the following threshold conditions:  The requesting spouse must have filed a joint return for the taxable years for which relief is sought; the requested relief must not have been available to the requesting spouse under section 6015(b) or (c); assets must not have been transferred between the spouses as part of a fraudulent scheme by the spouses to hide income or avoid tax; the nonrequesting spouse must not have transferred disqualified assets to the requesting spouse; the requesting spouse did not file or fail to file the return with fraudulent intent; and the income tax liability from which the requesting spouse seeks relief is attributable to an item of the individual with whom the requesting spouse filed the joint return.  For reasons set forth, the Court finds that petitioner satisfies these threshold requirements for equitable relief.

Respondent denied petitioner relief under section 6015(f) on the threshold ground that her request was untimely. The Court, however, has recently held that section 1.6015-5(b)(1), Income Tax Regs., imposing the 2-year limitation period in which to request relief, is an invalid interpretation of section 6015. See Hall v. Commissioner, 135 T.C. ___ (2010).[11] This factor is not dispositive of the outcome of this case.

Safe Harbor Requirements Under Rev. Proc. 2003-61, Sec. 4.02

Under the safe harbor of Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298, a spouse who has met the threshold requirements of Rev. Proc. 2003-61, sec. 4.01, will ordinarily be granted relief with respect to an underpayment of income tax reported on a joint return if all of the following three elements are satisfied: (1) On the date of the request for relief, the requesting spouse is divorced or separated from the other spouse, or has not been a member of the same household at any time during the preceding 12 months; (2) on the date the requesting spouse signed the joint returns, the requesting spouse had no knowledge or reason to know that the requesting spouse would not pay the

---

[11]In Hall v. Commissioner, 135 T.C. ___ (2010), this Court adhered to its decision in Lantz v. Commissioner, 132 T.C. 131, 150 (2009), which had been reversed by the Court of Appeals for the Seventh Circuit. See Lantz v. Commissioner, 607 F.3d 479 (7th Cir. 2010). Appeal here lies to the Court of Appeals for the Sixth Circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

income tax liability; and (3) the requesting spouse will suffer economic hardship if relief is not granted. Petitioner met the first requirement because she separated from Mr. Kelly at the time of filing the petition, and they were divorced when trial ended. Nonetheless, she failed to satisfy the other requirements.

Petitioner failed to meet the second requirement because she had knowledge or reason to know that Mr. Kelly would not or could not pay the tax liability shown on the return. Petitioner had actual knowledge of all items, specifically the severance payments, on the 2004 and 2005 returns. Mr. Kelly showed petitioner the returns reporting tax balances due. According to petitioner, she agreed to sign the returns because her husband promised that he would pay the tax balances due. Petitioner testified that she believed that Mr. Kelly either could be entrusted to carry out the task or had the means to pay the taxes owed. Nevertheless, petitioner failed to prove that it was reasonable for her to believe that Mr. Kelly would carry out the task of paying the tax for 2004 and 2005. Of petitioner and Mr. Kelly, petitioner was the one responsible for handling the finances and writing the checks to pay their tax for tax years 2001, 2002, and 2003. On the evidence petitioner presented, such as Mr. Kelly's drug and alcohol addictions and his erratic behavior, the Court does not find that petitioner had reason to

believe, when she signed the joint returns for 2004 and 2005, that Mr. Kelly would pay the reported income tax liabilities.

When petitioner filed her request for innocent spouse relief she acknowledged that she and Mr. Kelly had experienced financial problems, that made it difficult to pay their basic household expenses, let alone their tax liabilities.  A requesting spouse's knowledge of marital financial difficulties may deprive the requesting spouse of reason to believe that the nonrequesting spouse will pay the tax liability.  See, e.g., Stolkin v. Commissioner, T.C. Memo. 2008-211.  Moreover, petitioner is an educated person with over 20 years of experience in the financial industry advising others how to invest their money.  Surely petitioner had reason to realize that their finances were likely to prevent Mr. Kelly from paying their tax.  In addition, petitioner had knowledge of the severance payments Mr. Kelly received in 2004 and 2005 and apparently made no effort to insist on a tax payment when they had access to those large amounts of cash.

Last, petitioner failed to satisfy the third element required under the safe harbor provision.  The Court must consider whether holding petitioner liable for the tax would create an economic hardship for her.  Economic hardship is defined as the inability to meet "reasonable basic living expenses."  See sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs.

Petitioner bears the burden of proving that paying these tax liabilities would cause her an economic hardship.  Petitioner contends that her monthly income barely satisfies her expenses, much less allows her to pay her tax liabilities.  She fails to carry her burden of proof in that regard.  On the basis of the bank statements petitioner provided, it appears that her monthly income exceeds the amount she reported on Form 433-A.  Contrary to her testimony, her assets include Portfolio stock and an IRA at Charles Schwab & Co., Inc.  She has not shown which of the monthly expenses listed on her Form 433-A qualify as reasonable basic living expenses.

Relief Under Rev. Proc. 2003-61, Sec. 4.03

If relief is not available under Rev. Proc. 2003-61, sec. 4.02, then Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298-299, sets forth a list of factors that the IRS considers in determining whether to grant relief.  These factors are:  (1) Marital status; (2) economic hardship; (3) knowledge or reason to know; (4) nonrequesting spouse's legal obligation; (5) significant benefit; (6) good-faith effort to comply with tax laws; (7) spousal abuse; and (8) mental or physical health.  No single factor will be determinative in any particular case and each is weighed appropriately.  As already discussed, petitioner's knowledge or reason to know that her spouse would not pay the liabilities and her lack of economic hardship would

weigh against granting relief.  The Court then considers the following factors to decide whether petitioner is entitled to equitable relief.

1. Nonrequesting Spousal's Legal Obligation

Under Rev. Proc. 2003-61, sec. 4.03(2)(a)(iv), 2003-2 C.B. at 298, one factor is whether the nonrequesting spouse has a legal obligation to pay the outstanding income tax liability pursuant to a divorce decree or agreement.  However, if the requesting spouse knew or had reason to know when the agreement was entered into that the nonrequesting spouse would not pay the liability, then this factor will not weigh in favor of relief. See id.

Although Mr. Kelly was held liable under the divorce decree for the tax liabilities for the tax years 2004 and 2005, petitioner failed to demonstrate that when the decree was entered into, she had reason to believe that he would pay them. According to petitioner's testimony, Mr. Kelly was facing economic hardship and emotional turmoil.  Mr. Kelly neglected to participate in the divorce proceeding, causing the circuit court to enter a default judgment.  Therefore, this factor will not weigh in favor of relief.

2. Significant Benefit

It is considered a negative factor if the requesting spouse received a significant benefit (beyond normal support) from the

unpaid income tax liability. Petitioner used Mr. Kelly's severance payments to support her lifestyle. Petitioner's gross income for 2004 and 2005 was $56,250 and $55,625, respectively, but the mortgage payments alone on the home she shared with Mr. Kelly were $60,000 per year. Add to this the $1,500 per month spent on car payments and thousands of dollars per year on private schooling, groceries, cable television, horse expenses, and other expenses. It is clear that petitioner greatly benefited from the failure to pay the joint income taxes. The Court concludes that this factor weighs against granting petitioner relief under section 6015(f) from the 2004 and 2005 tax liabilities.

### 3. Compliance With Tax Laws

Another factor is whether petitioner has made a good-faith effort to comply with the Federal tax laws in the succeeding years.

The record is incomplete as to whether petitioner made a good-faith effort to comply with the Federal tax laws in 2006 or 2007. In 2008 she made a good-faith effort when she timely filed a return. On the record as a whole, the Court concludes that this factor is neutral.

### 4. Abuse

The revenue procedure considers spousal abuse as a factor to determine whether a spouse is entitled to relief under section

6015(f).  A history of abuse by the nonrequesting spouse may mitigate the negative effect of a requesting spouse's knowledge or reason to know.

Petitioner does not argue that Mr. Kelly physically abused her; instead, she contends that she was subjected to emotional abuse under Mr. Kelly's controlling behaviors and his addictions. This Court has held that mental and emotional abuse could mitigate the negative effect of a requesting spouse's knowledge or reason to know.  See Nihiser v. Commissioner, T.C. Memo. 2008-135.  The Court finds that petitioner in her interactions with her husband was not subjected to such emotional abuse.  This Court has hesitated, as it does here, to find such abuse where the marital conflict has been understandably distressing but does not significantly alter a requesting spouse's behavior.  See Sjodin v. Commissioner, T.C. Memo. 2004-205 (finding that a nonrequesting spouse's controlling and secretive nature did not rise to the level of abuse necessary to weigh as a factor in a requesting spouse's favor), vacated and remanded on another issue 174 Fed. Appx. 359 (8th Cir. 2006); Ewell v. Commissioner, T.C. Memo. 1988-265 (finding no abuse where the nonrequesting spouse was domineering but inflicted no physical abuse or mental intimidation).  Mr. Kelly may have abused illegal substances, but there is no evidence that he threatened or intimidated petitioner or their children, was verbally violent toward them, or behaved

in an abusive manner towards others in front of petitioner or their children. This factor is neutral because petitioner has not shown that Mr. Kelly's actions negate or mitigate the negative effect of petitioner's knowledge or reason to know that Mr. Kelly would fail to pay the 2004 and 2005 tax liabilities.

### 5. Other Factors

Petitioner contends that Rev. Proc. 2003-61, supra, fails to mention "the most significant factor", which is that petitioner did not know of her right to file a return with the status of married filing separately or the consequences of filing a joint income tax return. In evaluating whether to grant relief under section 6015(f), the Court can weigh all relevant factors, regardless of whether the factor is listed in Rev. Proc. 2003-61, sec. 4.03. After considering the factor which petitioner proffered, the Court does not find that it weighs in favor of granting her relief. On the basis of the level of petitioner's education, the amount of her control over the filing of the tax returns, and her extensive communication with the tax preparer, the Court finds this argument unpersuasive. Even if petitioner did not have a comprehensive understanding of tax laws, she had reason to know of her joint and several liability for the taxes shown on the joint returns. See Beatty v. Commissioner, T.C. Memo. 2007-167.

Additionally, the Court infers that petitioner failed to satisfy any of her and Mr. Kelly's 2004 and 2005 tax liabilities when she had control over a large sum of money. There is no evidence that in 2005 petitioner ever insisted on the payment of their 2004 income tax liability of $97,288 when petitioner and Mr. Kelly received the severance payment of $393,974. Nor was any of the $125,000 she received from Mr. Kelly in 2008 applied towards their tax liabilities for 2004 and 2005. Petitioner instead spent the $125,000 for other purposes. The Court infers from her actions that she was indifferent to her own responsibility to satisfy the 2004 and 2005 tax liabilities.

Of the eight factors, only one supports granting relief to petitioner. Nonetheless, this test cannot be mechanically conducted. After considering all the factors and circumstances, this Court determines that petitioner is not entitled to relief under section 6015(f). Petitioner's knowledge derived from her intimate involvement in the financial matters of the marriage, her knowledge of her husband's extravagant spending habits and substance abuse, and her knowledge of the protracted decline of the marriage should have put her on notice that relying on Mr. Kelly to pay the outstanding taxes owed on their joint Federal tax returns would be a poor choice.

Conclusion

For the reasons stated above petitioner is denied equitable relief from joint and several liability under section 6015(f).

The Court has considered the remaining arguments of both parties and, to the extent not discussed above, finds those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.