T.C. Memo. 2011-235

UNITED STATES TAX COURT

MICHELLE S. TORRISI, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6039-09.                    Filed September 29, 2011.

<u>Sara G. Neill</u> and <u>David V. Capes</u>, for petitioner.

<u>Steven W. LaBounty</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Pursuant to section 6015, petitioner seeks
review of respondent's determination to deny relief from joint
and several liability for unpaid Federal income taxes for 1997-
2000 under section 6015(f).[1]  Petitioner timely petitioned this

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code for the relevant periods, and all Rule
                                                (continued...)

Court.  The sole issue for decision is whether petitioner is entitled to relief under section 6015(f).

FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulations of facts are incorporated herein by this reference.  Petitioner resided in Missouri when she filed her petition.

I.  Petitioner's Family Life

Petitioner is a high school graduate who took some college courses but did not graduate from college.  In 1981 petitioner married Mark Anthony Torrisi (Mr. Torrisi).  Mr. Torrisi adopted petitioner's daughter, HT, and petitioner and Mr. Torrisi had another daughter, ST.  In the early years of marriage petitioner did not work outside the home, but later she worked part time.  From the 1990s Mr. Torrisi and petitioner resided at 432 Briarwyck Drive, Creve Coeur, Missouri (Briarwyck address or Briarwyck home).[2]

In 1990 Mr. Torrisi began to sell insurance policies for State Farm.  Mr. Torrisi became interested in selling insurance policies through petitioner's father, who was a State Farm agent.  Around the mid-1990s petitioner's father transferred part of his

---

[1](...continued)
references are to the Tax Court Rules of Practice and Procedure.

[2]The parties stipulated that petitioner and Mr. Torrisi resided at 432 Briarwyck Drive, Creve Coeur, Missouri.  The record also reflects the address as 432 Briarwyck, Ballwin, Missouri.

State Farm business to Mr. Torrisi. On a date that does not appear in the record, petitioner's father retired, and his clients' policies were gradually transferred to Mr. Torrisi, who had moved into petitioner's father's office.

Around the mid-1990s petitioner noticed a change in Mr. Torrisi's behavior. Mr. Torrisi became easily agitated. Petitioner described Mr. Torrisi as controlling, manipulative, and verbally and physically abusive. He screamed at petitioner, grabbed her, and scared her. On one occasion Mr. Torrisi threw her out a door.

About the same time that Mr. Torrisi's behavior changed, petitioner discovered that HT, who was 14 or 15 at the time, was using illegal drugs. HT's illegal drug use later developed into a more serious addiction.

In 1994 petitioner began to suffer from depression and anxiety. From the end of 1995 through 2000 petitioner saw a psychiatrist and a counselor. At some point before October 2000 she also started seeing Dr. Lipshitz, a psychologist. Around 1996 or 1997 petitioner started taking the antidepressant Wellbutrin.

In 1996 petitioner moved out of the Briarwyck home and started renting an apartment because she "couldn't stay [in the Briarwyck home] any longer". ST moved with petitioner.

Petitioner never returned to the marital home, which Mr. Torrisi continued to occupy.

After the separation, Mr. Torrisi provided petitioner and ST with financial support of $1,600 to $2,000 per month, and petitioner and Mr. Torrisi maintained separate bank accounts. Petitioner had no access to Mr. Torrisi's accounts.

Despite these developments, during the period 1997-2000 petitioner worked in Mr. Torrisi's office between 5 and 15 hours weekly. She answered phone calls, answered clients' questions, and took claims. However, petitioner had no authority to make decisions. Mr. Torrisi maintained a business checking account, but petitioner had no access to the account, bank statements, or business ledgers, nor did she know about gross receipts of Mr. Torrisi's insurance business. Mr. Torrisi paid petitioner a salary from which he withheld Federal income tax, and he issued her Forms W-2, Wage and Tax Statement.

From 1997 through September 2000 petitioner regularly assisted Mr. Torrisi in paying bills, although Mr. Torrisi paid some bills himself. When they paid bills together, Mr. Torrisi handed petitioner a blank check and told her to whom she had to write it and in what amount. Petitioner filled in the check as instructed and handed it back to him. Mr. Torrisi then posted the payment to a ledger, which petitioner could not access.

In November 1997 Mr. Torrisi found out he had a brain abscess, and he had it removed. During his recovery from the brain surgery Mr. Torrisi did not work for approximately 3 or 4 months. He asked petitioner to work in the office during his absence. Petitioner spent more time in the office than usual, working up to 20 hours weekly. Because Mr. Torrisi also had two secretaries who were licensed to sell insurance and had been in the insurance industry for a long time, the office functioned well in his absence.

Besides working for Mr. Torrisi part time, at various times during the years at issue petitioner worked part time in a sales position and as a florist. The sales and florist jobs paid minimum wage, and the employers issued petitioner Forms W-2. In 2000, in addition to working for Mr. Torrisi and at the florist's shop, petitioner also worked for May Department Stores Co. selling cosmetics. In 2001 petitioner's only employment was with May Department Stores Co.

In June 1998 Mr. Torrisi started to experience seizures. However, as long as he took his medication, the doctors were generally able to control the seizures. Nevertheless, Mr. Torrisi was taken to the hospital several times for 5 to 7 days each time. State Farm required Mr. Torrisi to undergo a series of tests to determine the extent of his inability to continue his

work. State Farm offered him disability retirement, but he refused it.

During the summer of 2000 State Farm again required Mr. Torrisi to undergo testing and thereafter required him to retire on disability because of his inability to recall items and his short-term memory loss. On September 30, 2000, Mr. Torrisi retired. On a date that does not appear in the record, Mr. Torrisi received termination pay[3] from State Farm.[4]

Petitioner's depression and anxiety persisted. In 2000 petitioner started seeing Dr. Rolando Larice (Dr. Larice), a psychiatrist. Petitioner continued to see Dr. Larice and was still taking medications for depression and anxiety as of the date of trial.

On a date in 2000 that does not appear in the record but which we infer was sometime after August 19, 2000, Mr. Torrisi approached petitioner about signing a home equity loan. At this time petitioner first learned that she and Mr. Torrisi still owed taxes for 1997-99. Mr. Torrisi had all the paperwork prepared

---

[3]Termination pay is the payment from State Farm to buy back Mr. Torrisi's business.

[4]Petitioner and Mr. Torrisi reported a State Farm disability payment of $43,661 on their joint return for 2002. The record does not disclose whether the disability payment reported on the 2002 return was a part of or all of the termination pay mentioned above.

and asked petitioner to sign the papers, which she did.[5]  Mr. Torrisi told petitioner that the loan proceeds would be sufficient to pay their bills.

On September 16, 2006, Mr. Torrisi died.  Petitioner was the beneficiary of Mr. Torrisi's life insurance, and in 2006 she received $600,000 in proceeds.

II.  Procedural History

After their separation, Mr. Torrisi insisted that he and petitioner file joint Federal income tax returns, which were prepared by a paid return preparer.  Petitioner did not gather the information for the return preparer.  She did not recall ever reviewing the returns before signing them; Mr. Torrisi usually just told petitioner to sign the returns.

Petitioner and Mr. Torrisi requested an extension of time to file their 1997 return and made a $15,000 payment with the request.  They filed the 1997 return untimely in October 1999. Petitioner signed the return but did not date it.  The 1997 return showed a balance due of $45,762, and petitioner knew about it.  A payment voucher was attached to the return.  Mr. Torrisi told petitioner to write a check to the Internal Revenue Service (IRS) for $2,000, and she did so on October 15, 1999.

---

[5]The record does not contain any documentation with respect to the home equity loan, including any documentation that the loan actually closed.

On January 12, 2000, petitioner and Mr. Torrisi untimely filed their joint 1998 return, which petitioner signed.  The return showed a balance due of $44,296, which Mr. Torrisi and petitioner did not pay when they filed the return.

On August 19, 2000, Mr. Torrisi and petitioner timely filed their 1999 return pursuant to an extension.  On the 1999 return they reported a balance due of $32,633, but they did not pay the balance when they filed the return.  Petitioner signed the return but did not date it.

On January 18, 2001, Mr. Torrisi and petitioner signed a Form 656, Offer in Compromise, with respect to their 1997-99 Federal income tax liabilities.  In item 6 of the Form 656 they checked "Doubt as to Collectibility" as the ground for the offer-in-compromise and offered to pay $37,000.  In Item 9, Explanation of Circumstances, they explained the circumstances of HT's drug treatment and family counseling, which were not covered by insurance.  They also described Mr. Torrisi's seizures:

> With a number of trips to the Emergency room as a result of the seizures. [sic] State Farm asked that taxpayer undergo a series of tests to determine the extent of (if any) his inability to continue his profession.  It was recommended that he take disability which he refused.  During the Summer of 2000, State Farm again tested taxpayer and this time required him to retire on disability due to his lack of being able to recall items, short term memory loss.  Retired on 9/30/00.

On or around June 12, 2002, Mr. Torrisi and petitioner retained Michael St. John (Mr. St. John) to represent them with respect to the 1997-2002 Federal income tax liabilities.

On or around June 10, 2002, petitioner signed but did not date the 2000 return, which showed a balance due of $29,459. When she signed the 2000 return, she knew there was a balance due for the 3 prior years. However, Mr. Torrisi assured her he had adequate income and that the Federal income tax liabilities would be paid.

The unpaid Federal income tax liabilities for the years at issue are as follows:

| Year | Amount | Penalties[1] | Interest[1] |
| --- | --- | --- | --- |
| 1997 | $30,333.64 | to be determined | to be determined |
| 1998 | 30,890.00 | to be determined | to be determined |
| 1999 | 30,407.00 | $9,077.75 | $30,255.36 |
| 2000 | 17,961.00 | 8,985.22 | 17,491.82 |

[1]The parties stipulated that interest and penalties for 1997 and 1998 could not be computed at the time of the stipulation because of respondent's inadvertent failure to place a "freeze code" on those years upon the expiration of the period of limitation on collection. Petitioner's filing of the request for sec. 6015 relief tolled the period of limitation. See sec. 6015(e)(2).

On August 1, 2002, petitioner filed her separate 2001 return reporting an overpayment.[6]  On the 2001 return she used the Briarwyck address as her home address.

On June 17, 2003, respondent issued two Letters 1058, Notice of Intent to Levy and Notice of Your Right to a Hearing (notices of intent to levy), one to Mr. Torrisi and one to petitioner.[7] The notices of intent to levy pertained to the 1997-2000 Federal income tax liabilities.  Respondent mailed both notices of intent to levy to the Briarwyck address in separate envelopes by certified mail.  On June 18, 2003, someone signed for one of the notices of intent to levy, and the U.S. Postal Service (USPS) returned the other notice of intent to levy to respondent.  The transcripts of petitioner's tax accounts for 1997-2000 show that one notice of intent to levy was delivered and the other one was returned "refused or unclaimed".  Those transcripts do not explain which of the two notices was returned.[8]  Respondent's revenue officer assigned to the case did not attempt to redeliver

---

[6]Petitioner attempted to file her 2001 return electronically using the name of Michelle S. Torrisi.  The return was rejected for processing because the Social Security number on the return did not match respondent's records.  Petitioner then filed her return using the name of Michelle S. Johnson, and that return was accepted for processing.

[7]For a husband and wife, the Commissioner mails a Letter 1058, Notice of Intent to Levy and Notice of Your Right to a Hearing, and the enclosures to each spouse in a separate envelope.

[8]Because of the passage of time, respondent's electronic case records and paper files are no longer available.

the notice of intent to levy that the USPS had returned to respondent.  Petitioner's position is that she did not receive a notice of intent to levy dated June 17, 2003.

Petitioner and Mr. Torrisi timely filed their 2002-05 joint returns pursuant to extensions.[9]  Petitioner timely filed her 2006 return.[10]  Petitioner filed her 2007 individual return late, although the tax liability shown thereon was timely paid. Petitioner timely filed her 2008 return pursuant to an extension.

On January 31, 2008, respondent sent a notice of Federal tax lien (NFTL) with respect to 1997-2000 and 2003 addressed to Mr. Torrisi and petitioner.  On February 4, 2008, respondent mailed a Letter 1058, Notice of Intent to Levy and Notice of Your Right to a Hearing, with respect to Mr. Torrisi's 2001 Federal income tax liability.  The notice of intent to levy dated February 4, 2008, was addressed to "MARK A TORRISI DECD MICHELLE TORRISI".  On February 13, 2008, respondent mailed an NFTL with respect to 1997-2000 and 2003.  Respondent addressed it to Mr. Torrisi and petitioner.  On March 5, 2008, respondent mailed a Form 8519, Taxpayer's Copy of Notice of Levy, with respect to 1997-2000.  It was addressed to "MARK A DECD & MICHELLE TORRISI".

---

[9]The account transcripts in the record show zero balances for each of these years.

[10]Petitioner marked the 2006 return as joint, stating that Mr. Torrisi was deceased.

On or about September 3, 2008, petitioner filed a Form 8857, Request for Innocent Spouse Relief, with respect to 1997-2000. On September 22, 2008, respondent issued a preliminary determination denying petitioner's request for relief under section 6015. On October 16, 2008, petitioner completed and signed a Form 12509, Statement of Disagreement. On January 29, 2009, the Appeals Office issued a final Appeals determination (final determination). Respondent denied petitioner's request for relief under section 6015(b), (c), and (f) on the ground that petitioner did not file her request within 2 years from the date respondent initiated collection activity against her.

III. Petitioner's Financial Circumstances as of the Trial Date

After receiving life insurance policy proceeds of $600,000 as a result of Mr. Torrisi's death, petitioner spent approximately $75,000 to repair the Briarwyck home because it was in poor shape and needed considerable work before it could be sold. In addition petitioner made monthly mortgage payments of $1,800 on the Briarwyck home and paid utility bills. At the end of 2007 petitioner sold the Briarwyck home at a profit of $25,000. Petitioner deposited the money in an account with Mr. St. John for use in paying the IRS. Petitioner also paid $15,000 of ST's college tuition and room and board. Petitioner did not make a lump-sum payment to the IRS using the life insurance proceeds.

Since 2007 petitioner's expenses have exceeded her income, and petitioner has used the remaining life insurance proceeds for her and HT's living expenses.[11]  Petitioner does not own a home. She owns two vehicles (with no loan with respect to either vehicle) with the combined value between $4,000 and $5,000.  HT, who at the time of trial was 30 years old, lives with petitioner, and petitioner continues to support her.  Petitioner has paid all of HT's expenses, including expenses for methadone treatment,[12] food, clothes, and medical and dental care.  HT has seizures and needs psychiatric treatment.  After she had seizures at her last place of work, HT's former employer told her they would not rehire her for liability reasons.

Petitioner invested the remaining life insurance proceeds and lost approximately $130,000 in investment value because of the market decline.  As of the date of trial petitioner had investments valued at approximately $175,000 that were acquired with the insurance proceeds.

As of the time of trial petitioner had been employed by Nordstrom for 9 months selling cosmetics.  She is paid $15 per hour, receives no benefits, and works 33 or more hours per week.

---

[11]Legal expenses constituted a large portion of petitioner's expenses.  They totaled $11,800 in 2009 and at least $30,000 in 2010.

[12]As of the time of trial HT no longer received methadone treatment.

Income from the investments and the investment principal supplement the wages she receives at Nordstrom.

IV. Notice 2011-70, 2011-32 I.R.B. 135

As discussed above, respondent denied petitioner's request for section 6015(f) relief as untimely because she filed it on September 3, 2008, which was more than 2 years after June 17, 2003, when respondent mailed the notices of intent to levy. Respondent relied on section 1.6015-5(b)(1), Income Tax Regs., which required a requesting spouse to file a request for relief no later than 2 years from the date of the first collection activity.

After the parties filed posttrial briefs, the IRS issued Notice 2011-70, 2011-32 I.R.B. 135 (notice), expanding the period within which individuals may request equitable relief from joint and several liability under section 6015(f). According to the notice, the IRS will consider requests for equitable relief under section 6015(f) if the period of limitation on collection of taxes under section 6502 remains open for the years at issue.[13] In the notice the IRS states that the Department of Treasury and

_____

[13]Subject to a number of exceptions, see, e.g., sec. 6501(c), (e), sec. 6501(a) provides that the amount of any tax shall be assessed within 3 years after the return was filed. Once the IRS makes a timely assessment, sec. 6502 restricts the time for collection by levy or by a judicial proceeding. The levy must be made or the judicial proceeding must be commenced within 10 years after the assessment or before the expiration of any period for collection agreed to in writing by the parties. In limited circumstances the IRS can obtain an extension of the period for collection. See sec. 6502(a)(2).

the IRS concluded that the regulations under section 6015 should be revised and that requesting spouses would no longer be required to submit a request under section 6015(f) within 2 years of the first collection activity.  The notice provides for transitional rules, stating in relevant part:  "In any case in litigation in which the IRS denied a request for equitable relief under section 6015(f) as untimely, the IRS or the United States will take appropriate action in the case as to the timeliness issue consistent with the position announced in this notice." The notice is effective on July 25, 2011.

After the IRS issued the notice, the parties filed with the Court a supplemental stipulation of facts.  The parties stipulated that respondent received petitioner's Form 8857 before the expiration of the period of limitation on collection of taxes under section 6502.  On the basis of the guidelines in the notice, the parties now agree that petitioner's request for equitable relief from joint and several liability under section 6015(f) was timely.

## OPINION

### I.   Section 6015

In general, married taxpayers who file a joint Federal income tax return are jointly and severally liable for the tax reported or reportable on the return.  Sec. 6013(d)(3).  Section 6015 allows a spouse to obtain relief from joint and several

liability in certain circumstances. Section 6015(a)(1) provides that a spouse who has made a joint return may elect to seek relief from joint and several liability under section 6015(b) (dealing with relief from liability for an understatement of tax with respect to a joint return). Section 6015(a)(2) provides that an eligible spouse may elect to limit that spouse's liability for any deficiency with respect to a joint return under section 6015(c) (dealing with relief from joint and several liability for taxpayers who are no longer married or who are legally separated or no longer living together). If a taxpayer does not qualify for relief under either section 6015(b) or (c), the taxpayer may seek equitable relief under section 6015(f). Under section 6015(f), the Secretary[14] has discretion to grant equitable relief to a spouse who filed a joint return with an unpaid liability or to one who has a deficiency (or any portion). See also sec. 1.6015-4(a), Income Tax Regs.

The parties agree that petitioner is not entitled to relief under section 6015(b) or (c). Petitioner contends she is entitled to relief from joint and several liability under section 6015(f).

II. <u>Jurisdiction</u>

The Tax Court is a court of limited jurisdiction, and we may exercise our jurisdiction only to the extent authorized by

---

[14]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

Congress.  See sec. 7442.  We have jurisdiction to determine whether petitioner qualifies for section 6015(f) relief.  See sec. 6015(e); see also Kollar v. Commissioner, 131 T.C. 191, 196 (2008).

III.  The Standard and Scope of Review

In Porter v. Commissioner, 132 T.C. 203, 210 (2009), we held that in determining whether the taxpayer is entitled to equitable relief under section 6015(f), we apply a de novo standard of review and a de novo scope of review.[15]  Petitioner bears the burden of proving that she is entitled to relief under section 6015(f).  See Porter v. Commissioner, supra at 210; see also Rule 142(a).

IV.  The Effect of the Notice

As discussed supra pp. 14-15, in the final determination respondent denied petitioner's request on the ground of untimeliness.  Before the issuance of the notice the parties disagreed whether the June 17, 2003, notice of intent to levy triggered the 2-year period for filing a request for relief from joint and several liability because petitioner's position was that she never received it.  In addition, petitioner contended that if the 2-year period had started to run, section 1.6015-5(b)(1), Income Tax Regs., which establishes the 2-year deadline,

---

[15]On brief respondent disagrees with Porter v. Commissioner, 132 T.C. 203 (2009), and contends that the proper standard of review is abuse of discretion.  We decline to revisit Porter.

was an invalid construction of section 6015.[16]  In the light of the notice, the parties stipulated that petitioner's request for relief was timely.

Although respondent denied petitioner's request for section 6015(f) relief solely on the ground of untimeliness, neither party argues that the stipulation that petitioner's request for relief under section 6015(f) was timely entitles petitioner to a decision in her favor.  Rather, the parties appear to recognize that we must still decide whether petitioner is entitled to section 6015(f) relief.  We agree.  Despite respondent's concession of the timeliness issue, the parties' dispute is far from being resolved.  The workpaper prepared by an IRS employee dated July 17, 2009, contained in the record shows that respondent reviewed petitioner's request using the factors set out in Rev. Proc. 2003-61, 2003-2 C.B. 296, and concluded, without stating so in the final notice, that she was not entitled to relief from joint and several liability under section 6015(f).

---

[16]In Lantz v. Commissioner, 132 T.C. 131 (2009), revd. 607 F.3d 479 (7th Cir. 2010), we held that the 2-year deadline imposed by sec. 1.6015-5(b)(1), Income Tax Regs., is an invalid interpretation of sec. 6015(f).  See Pullins v. Commissioner, 136 T.C. ___, ___ (2011) (slip op. at 15); Hall v. Commissioner, 135 T.C. 374 (2010), on appeal (6th Cir., Dec. 7, 2010); Mannella v. Commissioner, 132 T.C. 196, 202 (2009), revd. on other grounds 631 F.3d 115 (3d Cir. 2011).  The U.S. Courts of Appeals for the Seventh and Third Circuits have reversed Lantz and Mannella.  See Mannella v. Commissioner, 631 F.3d 115 (3d Cir. 2011); Lantz v. Commissioner, 607 F.3d 479 (7th Cir. 2010).  The U.S. Court of Appeals for the Fourth Circuit also upheld the validity of sec. 1.6015-5(b)(1), Income Tax Regs.  See Jones v. Commissioner, 642 F.3d 459 (4th Cir. 2011).

At trial and on brief the parties addressed the merits of petitioner's request, citing evidence related to petitioner's knowledge of the unpaid Federal income tax liabilities, economic hardship, mental and physical health, and spousal abuse.  In addition, the parties stipulated that "Respondent does not waive or confess error with respect to any other grounds for the denial of petitioner's request for equitable relief under I.R.C. § 6015(f) for underpayments of her income taxes for 1997, 1998, 1999 and 2000."

Section 6015(e) provides that in the case of an individual who requests equitable relief under section 6015(f), "In addition to any other remedy provided by law, the individual may petition the Tax Court (and the Tax Court shall have jurisdiction) to determine the appropriate relief available to the individual".  Relying on section 6015(e) and in particular the word "determine" contained therein, we held in Porter v. Commissioner, supra at 208-210, that in determining whether the taxpayer is entitled to equitable relief under section 6015(f), we apply a de novo standard of review and a de novo scope of review.  A de novo standard of review means that the reviewing court must make an "'independent determination of the issues.'" 3 Childress & Davis, Federal Standards of Review, sec. 15.02, at 15-3 to 15-5 (4th ed. 2010) (quoting United States v. First City Natl. Bank, 386 U.S.

361, 368 (1967)). Accordingly, we shall consider petitioner's request for relief under section 6015(f) on the merits.

V.   Rev. Proc. 2003-61

The Commissioner analyzes requests for section 6015(f) relief filed on or after November 1, 2003, using procedures set forth in Rev. Proc. 2003-61, supra.  See Porter v. Commissioner, supra at 210.  We consider all relevant facts and circumstances in determining whether the taxpayer is entitled to relief.  Id. We determine whether requirements set forth in Rev. Proc. 2003-61, supra, were satisfied in deciding whether a taxpayer qualifies for section 6015(f) relief.  See, e.g., Pugsley v. Commissioner, T.C. Memo. 2010-255; O'Meara v. Commissioner, T.C. Memo. 2009-71.

A.   Rev. Proc. 2003-61, Sec. 4.01:  The Threshold Requirements

The Commissioner generally will not grant relief unless the taxpayer meets seven threshold requirements.  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297.  The seven threshold requirements are:  (1) The requesting spouse filed a joint return for the taxable year or years for which relief is sought; (2) the requesting spouse does not qualify for relief under section 6015(b) or (c); (3) the requesting spouse applies for relief no later than 2 years after the date of the Commissioner's first collection activity after July 22, 1998, with respect to the requesting spouse; (4) no assets were transferred between the

spouses filing the joint returns as part of a fraudulent scheme by such spouses; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (6) the requesting spouse did not file the returns with fraudulent intent; and (7) the liability from which relief is sought is attributable to an item of the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.01.

Before the issuance of the notice, the parties stipulated, and respondent conceded on brief, that petitioner satisfied all of the threshold conditions except for the timeliness of her request, which was the third condition of Rev. Proc. 2003-61, sec. 4.01. Respondent now stipulates he no longer contests the timeliness of petitioner's request, and consequently petitioner satisfied all threshold requirements for relief under section 6015(f). We therefore consider whether petitioner is entitled to section 6015(f) relief under Rev. Proc 2003-61, sec. 4.02 and 4.03.

B.   Rev. Proc. 2003-61, Sec. 4.02:  The Safe Harbor Requirements

If a requesting spouse fulfills the threshold requirements of Rev. Proc. 2003-61, sec. 4.01, the Commissioner ordinarily will grant relief from joint and several liability with respect to underpayments on a joint Federal income tax return, provided the following additional requirements are met:  (1) On the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting

spouse; (2) on the date the requesting spouse signed the joint return, the requesting spouse did not know, and had no reason to know, that the nonrequesting spouse would not pay the tax liability; and (3) the requesting spouse will suffer economic hardship if the Commissioner does not grant relief. Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298. Respondent contends that petitioner has not established that the second and third safe harbor requirements are met.

### 1. Taxable Years 1997-99

#### a. The Knowledge or Reason To Know Requirement

Respondent contends that petitioner has not established that she had no knowledge or reason to know on the dates she signed the returns that the underpayments reported on those returns would not be paid. As stated above, Rev. Proc. 2003-61, sec. 4.02(1)(b), provides that ordinarily, the Commissioner will grant equitable relief under section 6015(f) with respect to underpayments on joint returns if:

> On the date the requesting spouse signed the joint return, the requesting spouse had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability. The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported income tax liability. * * *

Petitioner and Mr. Torrisi filed their 1997 return more than 1 year late and their 1998 return 5 months late. Mr. Torrisi asked petitioner to write a check payable to the IRS for $2,000

although the 1997 return showed tax due of $45,762. Petitioner testified that when she signed the 1998 return, she did not know that she and Mr. Torrisi still had a Federal income tax liability for 1997.

Because Mr. Torrisi and petitioner filed the 1997 and 1998 returns late, petitioner should have questioned whether Mr. Torrisi would enclose payments with the returns. This is particularly true with respect to the 1997 Federal income tax liability because Mr. Torrisi told petitioner to write a check in an amount different from the amount shown on the 1997 return as tax due. However, petitioner credibly testified that she did not assist Mr. Torrisi in paying all bills, and the record establishes that Mr. Torrisi's business was still generating substantial income at this time. We find it was reasonable for her to believe that Mr. Torrisi would pay the remaining amounts due for tax years 1997 and 1998.

Respondent contends that petitioner knew that Mr. Torrisi could not pay the taxes because of his medical condition and its effect on his business. The record is somewhat contradictory as to the effect of Mr. Torrisi's illness on the business. For example, petitioner attached to her request for section 6015 relief a document dated April 4, 2000, prepared by Mr. Torrisi. Mr. Torrisi wrote that medication for controlling seizures left him unable to concentrate and that his ability to perform as a

productive agent continued to diminish. Petitioner credibly testified, however, when Mr. Torrisi was recovering from his surgery in 1997, the business functioned as usual. Petitioner also credibly testified that during high school she worked with her father answering phones and filing paperwork and that before marrying Mr. Torrisi she worked at her father's agency full time. She observed then that her father's insurance business earned profit through commissions on insurance policies, and once a policy was sold, it was easily renewed. We find credible petitioner's testimony that in January 2000, when she signed the 1998 return, she believed the insurance business would continue to do well because her father's customers continued to transfer to Mr. Torrisi. This finding is further supported by the fact that the business' gross receipts did not disappear despite Mr. Torrisi's surgery and seizures, albeit gross profits gradually declined.[17]

We also conclude that when petitioner signed the 1999 return on August 19, 2000, she had no reason to know that Mr. Torrisi would not pay the 1999 Federal income tax liability. Until his

_____

[17]Gross receipts of the insurance business were as follows:

| Year | Gross Receipts |
|------|----------------|
| 1997 | $305,260 |
| 1998 | 282,777 |
| 1999 | 246,067 |
| 2000 | 201,289 |

Mr. Torrisi retired on Sept. 30, 2000.

retirement on September 30, 2000, Mr. Torrisi continued to run the insurance business and to have the stream of income from the business. Petitioner did not know then that the Federal income tax liabilities for 1997 and 1998 remained unpaid. She found out that the 1997-99 Federal income tax liabilities remained unpaid when Mr. Torrisi asked her to sign the paperwork for the home equity loan, which occurred sometime toward the end of 2000.[18] Accordingly, we conclude that when petitioner signed the 1997-99 returns, she had no knowledge or reason to know that Mr. Torrisi would not pay the 1997-99 Federal income tax liabilities.

### b. Economic Hardship

The parties disagree whether petitioner would suffer economic hardship if she were not granted relief. Generally, in determining whether a requesting spouse will suffer economic hardship if the Commissioner denies his or her request for section 6015(f) relief, Rev. Proc. 2003-61, sec. 4.02, directs the Commissioner to base his decision on rules similar to those found in section 301.6343-1(b)(4), Proced. & Admin. Regs. Section 301.6343-1(b)(4), Proced. & Admin. Regs., provides that an economic hardship exists if an individual is unable to pay reasonable basic living expenses. In determining a reasonable amount for basic living expenses, the Commissioner shall consider

---

[18]We infer from the record that petitioner and Mr. Torrisi applied for the home equity loan sometime after Aug. 19, 2000, most likely to fund the offer-in-compromise dated Jan. 18, 2001.

information provided by the taxpayer, including: (1) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else; (2) the amount reasonably necessary for food, clothing, housing, utilities, medical expenses, transportation, child support, and other necessities; (3) the cost of living in the geographical area in which the taxpayer lives; (4) the amount of property available to pay the taxpayer's expenses; (5) any extraordinary expenses, including educational expenses; and (6) any other factor that the taxpayer brings to the Commissioner's attention that bears on economic hardship. Sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs. The determination of a reasonable amount of basic living expenses will vary according to the unique circumstances of the individual taxpayer. Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs.

Petitioner contends her expenses in 2010 (through July) were as follows:

| Expense | Amount |
| --- | --- |
| Rent | $7,000 |
| Water | 350 |
| Electricity | 2,625 |
| Trash | 175 |
| Cell phone | 1,330 |
| Home phone with Internet | 406 |
| Rental and life insurance | 1,120 |
| Groceries | 2,800 |
| Personal hygiene items | 350 |
| Gas | 1,680 |
| Car maintenance and licenses | 750 |
| Auto insurance (including ST) | 3,800 |
| Personal property tax (auto) | 400 |
| Medical insurance | 1,050 |
| Medical deductible | 2,500 |
| Carpal tunnel surgery[1] | 1,500 |
| Prescriptions | 525 |
| Therapist copay amounts | 140 |
| Unreimbursed employee expenses[2] | 910 |
| Legal fees | 30,000 |
| HT--food | 1,750 |
| Total | 61,161 |

[1]Petitioner testified this surgery was not covered by insurance, and she will have to undergo similar surgery on her other hand.

[2]This item consists of cosmetics and supplies. Petitioner testified she must "have a nice presentation at work", including "really good" "costly" shoes, haircuts, and manicures.

According to petitioner, her wages for the same period were $13,860. She does not own a home and has two cars with a total value between $4,000 and $5,000.

However, in 2006 petitioner received $600,000 in proceeds from Mr. Torrisi's life insurance, of which she claims to have $175,000 left. To explain the decline in assets, petitioner contends that she (1) lost $130,000 of investments because of the market decline, (2) paid $15,000 for ST's college tuition, (3)

spent $75,000 to repair the Briarwyck home in 2007, and (4) used the life insurance proceeds to supplement her wages to meet her living expenses.[19] Some of the expenses petitioner paid in 2007-2010, however, can hardly be classified as basic, such as a $190 monthly T-Mobile cell phone plan, a $2,000 "healing vacation" with her children, bulldozer rental to remove trees on her mother's land in 2008, and HT's legal fees of $18,000 and petitioner's legal fees, which, as of the date of trial, totaled $41,800. In any case, the remaining $175,000 of the life insurance proceeds can be included in determining whether petitioner would be able to pay her basic living expenses. See, e.g., Butner v. Commissioner, T.C. Memo. 2007-136.

Even if we ignore those expenses that cannot be characterized as reasonable or necessary, petitioner established that she would suffer economic hardship if she were required to pay the 1997-99 Federal income tax liabilities. We recognize petitioner's special circumstances and the necessity to support HT and also the fact that because of petitioner's professional

---

[19]Petitioner explains that she used the life insurance proceeds for her living expenses because her expenses since Mr. Torrisi's death have always exceeded her income:

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Income | $49,780 | $33,046 | $21,033.61 | $13,860 |
| Expenses | 71,629 | 112,830 | 76,918.92 | 61,161 |
| Difference | (21,489) | (79,784) | (55,885.31) | (47,301) |

Income and expenses for 2010 are presented through July.

background her earning potential is unlikely to improve in the short term. We also recognize that petitioner's reasonable expenses, even if substantially reduced, will likely continue to exceed her income. If she were required to pay the 1997-99 Federal income tax liabilities, even without taking into account interest and penalties for 1997 and 1998, her remaining assets would be depleted substantially. Petitioner submitted sufficient evidence to convince us that requiring her to pay the 1997-99 Federal income tax liabilities would put her in severe financial hardship. Accordingly, we conclude that petitioner satisfies the safe harbor requirements of Rev. Proc. 2003-61, sec. 4.02, with respect to the 1997-99 Federal income tax liabilities and therefore is entitled to section 6015(f) relief with respect to those years.

2. <u>Taxable Year 2000: The Knowledge or Reason To Know Requirement</u>

With respect to 2000, petitioner had reason to know when she signed the 2000 return that Mr. Torrisi would not pay the 2000 tax liability. Mr. Torrisi retired as of September 2000 and no longer had a steady income. Petitioner had relied previously on his assurances that the liabilities would be paid, but she learned that she and Mr. Torrisi still had Federal income tax liabilities for 1997-99 when they applied for a home equity loan at the end of 2000. In addition, on January 18, 2001, Mr. Torrisi and petitioner submitted an offer-in-compromise to the

IRS.  At least as of the January 18, 2001, offer-in-compromise, petitioner knew Mr. Torrisi could not pay the outstanding Federal income tax liabilities for 1997-99 out of their assets and income.  When she signed the 2000 return on June 10, 2002, she knew there was a balance due for 3 prior years.  Petitioner's reliance on Mr. Torrisi's assurances that the 2000 Federal income tax liability would be paid was not reasonable.

Petitioner claims that she understood that Mr. Torrisi would use the proceeds of the home equity loan to pay the outstanding Federal income tax liabilities and that the home equity loan supports the reasonableness of her belief that the taxes would be paid.  We disagree with petitioner's interpretation.  Petitioner did not introduce any evidence regarding the amount of the home equity loan.  Absent proof that the amount of the home equity loan was sufficient to pay all of the 1997-2000 Federal income tax liabilities, petitioner's argument about the reasonableness of her belief is not convincing.  Once petitioner found out that Mr. Torrisi had failed to pay taxes for the prior years from his business income or from the payment made to him upon his retirement, her reliance on his subsequent assurances that the 2000 Federal income tax liability would be paid became unreasonable.  We conclude that petitioner had reason to know that the underpayment reported on the 2000 Federal income tax return would not be paid.

Petitioner points out that she was under psychiatric treatment for depression and was taking medications for depression and anxiety. No credible evidence in the record, however, supports a finding that depression and anxiety affected her understanding of her Federal income tax obligations or her ability to comply with them. We reject petitioner's argument that her depression and anxiety affected her belief as to whether Mr. Torrisi would pay the taxes due. Accordingly, petitioner does not satisfy the safe harbor requirements of Rev. Proc. 2003-61, sec. 4.02 with respect to 2000.

    C.   <u>Rev. Proc. 2003-61, Sec. 4.03: Factors for Determining Whether To Grant Equitable Relief</u>

If a requesting spouse satisfies the threshold requirements of Rev. Proc. 2003-61, sec. 4.01, but fails to satisfy one or more of the safe harbor requirements of Rev. Proc. 2003-61, sec. 4.02, the Commissioner may still grant relief under section 6015(f) on the basis of the facts and circumstances test. The following list of factors is not exclusive, and no single factor is determinative:

        (a) Factors that may be relevant to whether the Service will grant equitable relief include, but are not limited to, the following:

        (i) <u>Marital status</u>. Whether the requesting spouse is separated (whether legally separated or living apart) or divorced from the nonrequesting spouse. * * *

        (ii) <u>Economic hardship</u>. Whether the requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue

procedure) if the Service does not grant relief from the income tax liability.

(iii) <u>Knowledge or reason to know</u>.

(A) <u>Underpayment cases</u>. In the case of an income tax liability that was properly reported but not paid, whether the requesting spouse did not know and had no reason to know that the nonrequesting spouse would not pay the income tax liability.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(iv) <u>Nonrequesting spouse's legal obligation</u>. Whether the nonrequesting spouse has a legal obligation to pay the outstanding income tax liability pursuant to a divorce decree or agreement. \* \* \*

(v) <u>Significant benefit</u>. Whether the requesting spouse received significant benefit (beyond normal support) from the unpaid income tax liability or item giving rise to the deficiency. See Treas. Reg. § 1.6015-2(d).

(vi) <u>Compliance with income tax laws</u>. Whether the requesting spouse has made a good faith effort to comply with income tax laws in the taxable years following the taxable year or years to which the request for relief relates.

Rev. Proc. 2003-61, sec. 4.03(2)(a), 2003-2 C.B. at 298.

(b) Factors that, if present in a case, will weigh in favor of equitable relief, but will not weigh against equitable relief if not present in a case, include, but are not limited to, the following:

(i) <u>Abuse</u>. Whether the nonrequesting spouse abused the requesting spouse. The presence of abuse is a factor favoring relief. A history of abuse by the nonrequesting spouse may mitigate a requesting spouse's knowledge or reason to know.

(ii) <u>Mental or physical health</u>. Whether the requesting spouse was in poor mental or physical health on the date the requesting spouse signed the return or at the time the requesting spouse requested relief.

> The Service will consider the nature, extent, and duration of illness when weighing this factor.

Rev. Proc. 2003-61, sec. 4.03(2)(b), 2003-2 C.B. at 299.  We now consider each of these factors as they apply to the 2000 liability.

### 1.    Marital Status

Mr. Torrisi was deceased at the time petitioner sought section 6015 relief, and being a widow is "tantamount to her being separated or divorced."  Rosenthal v. Commissioner, T.C. Memo. 2004-89.  This factor weighs in favor of relief.

### 2.    Economic Hardship

With respect to the 2000 liability petitioner failed to prove that she would suffer economic hardship if she were to pay the 2000 liabilities.  The 2000 liability, including interest and penalty, is $44,438.04.  As of the date of trial, petitioner had $175,000 of the life insurance proceeds remaining.  The payment of the 2000 tax liability, even if we were to take into account petitioner's future low earning potential, would not deplete all of her assets.  We conclude that petitioner has failed to prove that she would experience economic hardship if she were required to pay the 2000 Federal income tax liability.

### 3.    Knowledge or Reason To Know

For the reasons discussed supra pp. 29-31, we believe petitioner had reason to know that Mr. Torrisi would not pay the

income tax liability for 2000. This factor weighs against relief for 2000.

### 4. Nonrequesting Spouse's Legal Obligation

This factor concerns obligations arising pursuant to a divorce decree or agreement. Mr. Torrisi and petitioner separated but remained married. Accordingly, this factor is inapplicable.

### 5. Significant Benefit

The parties stipulated that petitioner did not receive significant benefit, beyond normal support, from the unpaid tax liabilities. This factor weighs in favor of relief.

### 6. Compliance With Income Tax Laws

Petitioner and Mr. Torrisi timely filed their 2002-05 returns pursuant to extensions, and payments for 2004 and 2006 were timely. Petitioner filed her 2007 return late although no taxes were due. Petitioner filed her 2008 return timely pursuant to an extension. This factor is neutral.

### 7. Abuse

Abuse is a factor that, if present, will weigh in favor of relief but will not weigh against relief if not present. See Rev. Proc. 2003-61, sec. 4.03(2)(b). We consider whether the nonrequesting spouse abused the requesting spouse. Id.

Petitioner testified that Mr. Torrisi became controlling, manipulative, and verbally and physically abusive. He screamed

at petitioner, grabbed her, and scared her.  On one occasion Mr. Torrisi threw her out a door.  Dr. Larice testified that petitioner had been depressed at least since 1996.  Between 1996 and the date of trial, petitioner saw doctors, a counselor, a psychologist, and psychiatrists.

On the other hand, after petitioner left Mr. Torrisi, she continued to work for him.  There is no credible evidence in the record that petitioner was forced to come to Mr. Torrisi's office.  Petitioner also continued to use the Briarwyck address as her address, which suggests that Mr. Torrisi and petitioner communicated on issues unrelated to the insurance business.  For example, all Forms W-2 that petitioner's employers issued to her bear the Briarwyck address as her home address.  Also, Mr. Torrisi and petitioner held an account at State Farm Investment Management Corp., which issued them a Form 1099-DIV, Dividends and Distributions.  The Form 1099-DIV shows both Mr. Torrisi and petitioner as residing at the Briarwyck address.  While we do not doubt that Mr. Torrisi's condition generated behaviors that caused petitioner to leave the marital home, petitioner has failed to convince us that this factor should be given weight.

### 8.   Mental or Physical Health

Generally, whether the requesting spouse was in poor mental or physical health on the date he or she signed the return or at the time he or she requested relief, is a factor that weighs in

favor of equitable relief.  Rev. Proc. 2003-61, sec. 4.03(2)(b).
We consider the nature, extent, and duration of illness when
weighing this factor.

During the years at issue petitioner was seeing various
doctors for her depression and anxiety.  No doubt HT's drug
addiction and the marital problems affected petitioner's mental
health.  As of the time of trial, petitioner continued to see Dr.
Larice for her depression and anxiety.  Petitioner testified that
she is generally in good health except that she has carpal tunnel
syndrome in her right hand for which she needs surgery.  She also
has back pain and pain in her legs and feet.  Nevertheless, these
problems do not prevent her from working.  Overall, we find this
factor weighs slightly in favor of relief.

### 9.   Other Factors

The list of factors set out in Rev. Proc. 2003-61, sec.
4.03, is nonexclusive, and therefore we may consider other facts
and circumstances.[20]  One additional circumstances we take into
account is petitioner's continuous depleting of the life
insurance proceeds despite the outstanding Federal income tax
liabilities for 1997-2000.  From Mr. Torrisi's death in September

---

[20]Respondent does not argue that timeliness of the request
is a factor in the analysis under Rev. Proc. 2003-61, sec. 4.03,
2003-2 C.B. 296, 298.  During a conference call between the
parties and the Court, counsel for respondent confirmed that
respondent does not allege that timeliness of the request is a
factor to be considered in deciding whether petitioner is
entitled to relief under sec. 6015(f).

2006 until April 22, 2008, petitioner made several payments totaling $3,000 towards the 1997 liability.[21]  She did not make a lump-sum payment to the IRS when she received the life insurance proceeds, nor did she increase her payments to reduce the tax liabilities.  Taking into account all the facts and circumstances, we conclude that it would not be inequitable to hold petitioner liable for the unpaid liability for 2000.

VI.  Conclusion

On the basis of the foregoing, we conclude that petitioner has satisfied the threshold conditions of Rev. Proc. 2003-61, sec. 4.01, and the safe harbor requirements of Rev. Proc. 2003-61, sec. 4.02, with respect to 1997-99 and that she is entitled to section 6015(f) relief for those years.  After taking into account the facts and circumstances of Rev. Proc. 2003-61, sec. 4.03, we conclude petitioner is not entitled to relief with respect to 2000.

We have considered the remaining arguments made by the parties, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

---

[21]Respondent also collected by levy $750 and $250 towards the 1997 and 2000 Federal income tax liabilities and credited $249.97 from other years.

To reflect the foregoing,

Decision will be entered for petitioner with respect to 1997, 1998, and 1999 and for respondent with respect to 2000.